# EXHIBIT L

LEXSEE 2006 U.S. DIST. LEXIS 15843

**LUCILA RIVERA and MARIANO LOPEZ, Plaintiffs, -v.- ATLANTIC CITY MEDICAL CENTER, Defendant.**

05 Civ. 6824 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2006 U.S. Dist. LEXIS 15843

March 30, 2006, Decided
March 30, 2006, Filed

**COUNSEL:** [*1] Chad Dickerson, Juan A. Baez, P.C., New York, NY, for Plaintiffs.

Yann Geron, Fox Rothschild LLP, New York, NY, for Defendant.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Plaintiff Lucila Rivera was injured when she slipped and fell on the boardwalk in Atlantic City, New Jersey, breaking her knee. Rivera and her husband, Mariano Lopez, bring this action against the Atlantic City Medical Center, now known as AtlantiCare Regional Medical Center ("ACMC"), where Rivera was treated and released, claiming that Rivera was injured due to negligent treatment at ACMC. ACMC moves to dismiss for lack of personal jurisdiction, improper venue, and ineffective service of process. The motion will be granted because the Court lacks personal jurisdiction over defendant.

**DISCUSSION**

In a diversity case, a federal court may exercise jurisdiction over a nonresident defendant if she is amendable to process under the law of the forum state, provided that the exercise of jurisdiction is consistent with the requirements of due process. Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris, 2004 U.S. Dist. LEXIS 19614, No. 03 Civ. 1681, 2004 WL 2199547, at *5 (S.D.N.Y. Sept. 29, 2004). [*2] Thus, it is first necessary to decide whether New York law permits the exercise of jurisdiction over defendant.

It is undisputed that ACMC, a New Jersey corporation whose sole places of business is in that state, is not subject to the general jurisdiction of the New York courts under N.Y. C.P.L.R. § 301, because it does not do business in New York in a manner so "continuous and systematic" as to be considered "present" in the state. Northrop Grumman, 2004 U.S. Dist. LEXIS 19614, 2004 WL 2199547, at *6. Plaintiffs accordingly must rely on the specific jurisdiction conferred by New York's long-arm statute, C.P.L.R. § 302. Plaintiffs in fact rely only on one of the subsections of that statute, section 302(a)(3)(ii), which permits New York courts to exercise personal jurisdiction over a nondomiciliary defendant, who "commits a tortious act without the state causing injury to a person or property within the state . . . if he . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." Plaintiffs contend that the requirements of this statute are [*3] satisfied, because ACMC's allegedly tortious act caused injury in New York, by causing Rivera to fall a second time after returning to New York by bus; ACMC should have expected such a consequence because it had reason to know that Rivera was a New York resident; and ACMC, as a hospital doing business in a city with a significant tourist trade, derives substantial revenue from out-of-state visitors.

The decision of the New York Court of Appeals in Ingraham v. Carroll, 90 N.Y.2d 592, 687 N.E.2d 1293, 665 N.Y.S.2d 10 (1997), is dispositive of this argument. In Ingraham, a New York plaintiff sued a Vermont physician for the wrongful death of his wife, who had alleg-

Case 7:07-cv-03129-SCR    Document 3-5    Filed 06/15/2007    Page 3 of 17

Page 2
2006 U.S. Dist. LEXIS 15843, *

edly been treated negligently by the defendant in Vermont, on referral from her New York physicians. The defendant was aware that his patient was from New York, and he "frequently" saw patients referred to him from a New York HMO. Id. at 595, 598. Nevertheless, the Court held that the defendant was not amenable to suit in New York under section 302(a)(3)(ii).

The Court assumed, without deciding, that defendant's alleged malpractice caused injury in New York, when his recommendations for treatment were followed by the decedent's [*4] New York primary physicians and her cancer spread in New York, id. at 597, and further concluded that because defendant was aware that his patient was from New York and was being treated in New York under his recommendations, he expected or should reasonably have expected that his actions would have consequences in New York, id. at 598. The Court ruled, however, that the third requirement of the statute was not met, because the defendant did not derive substantial revenue from interstate commerce. Id. at 598-600

This ruling was not based on the volume of the defendant's receipts from New York patients. Rather, the Court concluded that the "interstate commerce" provision of the statute was intended to "preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but 'whose business operations are of a local character.'" Id. at 599, quoting 12th Ann. Report of N.Y. Jud. Conf., at 342-343. Noting that "there is some support for the notion that the provision of medical services may *never* meet the definition of 'commerce' for jurisdictional purposes," [*5] id., citing Markham v. Gray, 393 F. Supp. 163, 166 (W.D.N.Y. 1975), aff'd on other grounds sub nom., Markham v. Anderson, 531 F.2d 634, 637 (2d Cir. 1976) (emphasis added), the Court found it sufficient to rule that the "because the [defendant] renders medical services wholly within his own State, he cannot be said to be engaging in interstate commerce." Id.

This was so even though defendant saw patients from New York on a regular basis:

> The situation where a local physician treats a nonresident patient is by no means uncommon. For example, local physicians may treat nonresident patients traveling on vacation, or, as in this case, because the physician's office is located close to a State border. Perhaps the most common example is where a physician is so outstanding a specialist in a particular field as to attract numerous referrals from other physicians. Such a physician may treat patients from many different States on a daily basis.

> The diversity of a physician's pool of patients, without more, cannot convert an otherwise local practice to an interstate business activity. A physician does not sell his or her services in interstate commerce [*6] by treating unsolicited patients that travel into the physician's home State seeking health care. . . . Unlike a manufacturer who introduces a product into the stream of commerce expecting it to be sold in other States, a physician treating patients in his or her home State is providing a service that is inherently personal, and local, in nature.

Id. at 599-600.

Since the question concerns the interpretation of a New York statute, this ruling by New York's highest court is controlling. [1] Here, as in Ingraham, plaintiff Rivera was treated by a New Jersey hospital in New Jersey. Like the physician in Ingraham, ACMC was aware that plaintiff was from New York and would return there to suffer the consequence of any malpractice committed by ACMC, and indeed it can be assumed (as plaintiff alleges) that ACMC, like the physician in Ingraham, had "frequent" occasion to treat New York or other out-of-state patients who were visiting the area to take advantage of the tourist attractions of Atlantic City. But for purposes of New York's long-arm statute, "the diversity of a physician's pool of patients, without more, cannot convert an otherwise local practice to an interstate [*7] business activity," and the treatment even of out-of-state patients in a local facility is "inherently personal, and local, in nature," and does not satisfy the "interstate commerce" requirement of section 302(a)(3)(ii). [2]

---

[1] The meaning of "interstate commerce" for purposes of federal constitutional law may be broader than the definition adopted in Ingraham, but is irrelevant to the interpretation of the phrase in the New York statute.

[2] Plaintiffs' citation of a subsequent Court of Appeals decision, LaMarca v. Pak-Mor Mfg. Co., 95 N.Y.2d 210, 735 N.E.2d 883, 713 N.Y.S.2d 304 (2000), is unavailing. In LaMarca, the Court distinguished Ingraham in the case of a "Texas corporation with a manufacturing facility in Virginia," holding that such a company "is inherently engaged in interstate commerce." Id. at 215. Remarkably, plaintiffs fail to discuss Ingraham, which is described and distinguished in LaMarca, and which plainly is more directly analogous to the facts of this case.

Since the [*8] Court lacks personal jurisdiction over defendant, the case must be dismissed, and it is unnecessary to address defendant's other arguments.

## CONCLUSION

Defendant's motion to dismiss for lack of personal jurisdiction (Dkt. No. 5) is granted, and the Clerk is respectfully directed to enter judgment accordingly.

SO ORDERED.

Dated: New York, New York

March 30, 2006

GERARD E. LYNCH

United States District Judge

# EXHIBIT M

LEXSEE 2001 U.S. DIST LEXIS 2274


Cited
As of: Jun 11, 2007

JOHN STANDLEY, Plaintiff, -v- LINDA LYDER and DENNIS BLIDEN, sued in their individual and official capacities, Defendants.

99 Civ. No. 4711 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2001 U.S. Dist. LEXIS 2274

March 6, 2001, Decided
March 7, 2001, Filed

**DISPOSITION:** [*1] Defendants motion to dismiss pursuant to Rule 12(b)(6) of Federal Rules of Civil Procedure granted.

**COUNSEL:** John Standley, Plaintiff, Pro se.

For Linda Lyder, Dennis Bliden, Defendants: Bruno V. Gioffre, Jr., of counsel, Assistant Attorney General, Eliot Spitzer, Attorney General of the State of New York, New York, NY.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION:**

OPINION AND ORDER

GERARD E. LYNCH, District Judge:

Plaintiff John Standley brings this action pro se pursuant to 42 U.S.C. § 1983, alleging defendants intentionally tampered with his incoming legal mail, and thus interfered with his ability to respond to a motion in a proceeding before the New York Court of Claims. Defendants move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted.

Background

A. Prior Proceedings

The original complaint in this action was filed on June 29, 1999. That complaint alleged, inter alia, that defendants engaged in a "systematic pattern of malice and reckless indifference of interfering and tampering with privileged correspondence." (Compl. [*2] P 1.) Then-Chief Judge Thomas P. Griesa immediately dismissed all of plaintiff's claims relating to alleged interference with his mail "save [those] concerning interference with his legal mail in PP30-34 [of the Complaint]." Standley v. Lyder, No. 99 Civ. 4711 (June 29, 1999). On December 27, 1999, Judge Griesa denied plaintiff's motion for reconsideration, but permitted plaintiff to amend the complaint "to include any new allegations regarding his legal mail" upon reassignment of the case to a different judge. Standley v. Lyder, No. 99 Civ. 4711 (TPG) (December 29, 1999). On April 4, 2000, the case was reassigned to Judge Harold Baer, Jr., and on June 21, 2000, plaintiff filed his Amended Complaint. The Amended Complaint recasts some of the claims dismissed by Judge Griesa as interference with "legal mail," but is otherwise identical to the original complaint; the only claims that survived the original complaint (Compl. PP 33-34) are recast in identical language (Am. Compl. PP 26-29). n1 The case was reassigned to me on September 15, 2000. Defendants now move to dismiss the remaining claim of interference with legal mail.

> n1 The Amended Complaint does not raise any additional claims of interference with legal mail, or any additional claims besides those al-

ready dismissed pursuant to Judge Griesa's Order of June 29, 1999. Judge Griesa made clear that "the instant complaint shall proceed only as it relates to the alleged interference with plaintiff's Court of Claims action." Standley v. Lyder, No. 99 Civ. 4711 (June 29, 1999). Plaintiff's claims that defendants inspected letters sent to plaintiff from, among others, the Mexican Embassy (Am. Compl. P 14), the National Archives and Records Administration (id. P 15), Justice Ruth Bader Ginsburg (id. PP 16, 17), and the United States Senate (id. P 19), do not rise to the level of a constitutional violation for substantially the reasons already stated by Judge Griesa. Standley v. Lyder, No. 99 Civ. 4711 (June 29, 1999), at notes 1 & 2 (citing Lewis v. Casey, 518 U.S. 343, 349-350, 135 L. Ed. 2d 606, 116 S. Ct. 2174 (1996) (requiring actual injury to an existing legal claim)). See, e.g., Wolff v. McDonnell, 418 U.S. 539, 576, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974) (defining "legal mail" generally as "communications . . . specifically marked as originating from an attorney, with his name and address being given"). Inspection by the authorities of incoming mail that involves neither attorney-client communications nor actual litigation documents does not implicate the right of reasonable access to the courts, and, contrary to plaintiff's apparent belief, does not constitute "legal mail." Accordingly, in addressing Standley's complaint, I consider only those facts relating to the claim of interference with legal mail that survived Judge Griesa's order.

[*3]

B. Facts

The facts alleged by plaintiff are as follows. During the events alleged in the Amended Complaint, plaintiff was incarcerated at the Green Haven Correctional Facility ("Green Haven"). (Am. Compl. P 3.) Defendant Linda Lyder ("Lyder") was the Senior Mail and Supply Clerk for the Facility. (Id. P 4.) Defendant Dennis Bliden was Green Haven's First Deputy Superintendent and was responsible for ensuring that all staff assigned to the Green Haven's Correspondence Office complied with Department of Corrections procedures for distributing inmate mail. (Id. P 5.)

On November 10, 1998, plaintiff received an Airborne Express package from the Office of the New York Attorney General, in regards to a legal proceeding pending before the New York Court of Claims. (Id. P 26.) The Court of Claims action was apparently brought by the Plaintiff against the State of New York, though it is unclear from the record what exactly that case entailed.

Plaintiff alleges that upon receipt of the package, defendant Lyder "intentionally opened [it] outside of plaintiff's presence." (Id. P 27.) Plaintiff further alleges that when he received the package "it appeared that some of [*4] the legal documents contained within had been intentionally removed" (id. P 27), though he does not allege what documents, if any, were missing. Plaintiff does not state when the New York Attorney General sent the package, or when it was received at Green Haven.

The basis of plaintiff's § 1983 claim is that the opening of the package frustrated his Court of Claims proceeding. (Id.) On December 22, 1998, the Court of Claims granted the state's motion to dismiss plaintiff's claim, in part (he alleges) because plaintiff failed to submit opposition papers. (Id. P 28.) On January 31, 1999, plaintiff wrote a letter to the Court of Claims alleging that he was unable to respond to the state's motion to dismiss "in light of the fact that the Airborne Express letter containing the Attorney General's motion to dismiss had been opened outside of plaintiff's presence and had been clearly tampered with." (Id. P 29.) On February 10, 1999, the Court of Claims informed plaintiff that he would still be permitted to submit papers in opposition (Pl.'s Mem. Law at 2), or to make a motion for reconsideration (id. P 30). Plaintiff does not state whether he availed himself of either [*5] opportunity, nor does he allege that he lost a meritorious claim on account of the defendant's alleged tampering with his legal mail. Rather, in opposition to the instant motion to dismiss, he claims only that "final adjudication was delayed several months." (Pl.'s Mem. Law at 2.)

Discussion

A. Legal Standard

A court may dismiss an action pursuant to Rule 12(b)(6), Fed. R. Civ. P., only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief.'" Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). In considering the motion, the court must take "as true the facts alleged in the complaint and draw[] all reasonable inferences in the plaintiff's favor." Jackson Nat. Life Ins. v. Merrill Lynch & Co., 32 F.3d 697, 699-700 (2d Cir. 1994). The court can dismiss the claim only if, assuming all facts alleged to be true, the plaintiff still fails to plead the basic elements of a cause of action. Where, as here, a plaintiff is proceeding pro se, the court must liberally construe [*6] the complaint. See, e.g., Boddie v. Schnieder, 105 F.3d 857, 860 (2d Cir. 1997). "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." Baker v. Cuomo, 58 F.3d 814, 818 (2d Cir. 1995).

Even afforded the liberal construction to which his pleadings are entitled, however, Standley's Amended Complaint must be dismissed for failure to state a claim upon which relief can be granted.

B. Standard Applied to Standley's Section 1983 Claim

Standley's allegations regarding interference with legal mail does not state a cause of action under § 1983. It is accepted that a prisoner must be present when, for whatever reason, legal mail (clearly marked as such) is opened by prison officials, Wolff, 418 U.S. at 547-76, and that the Constitution guarantees a prisoner's "reasonable access to the courts." Washington v. James, 782 F.2d 1134, 1138 (2d Cir. 1986) (citing Bounds v. Smith, 430 U.S. 817, 821-23, 52 L. Ed. 2d 72, 97 S. Ct. 1491 (1977)). But Second Circuit decisions make clear that one isolated incident of interference with legal mail does not state a claim [*7] for denial of reasonable access to courts. See James, 782 F.2d at 1139 (prisoner states a claim where he "indicates an alleged continuing activity rather than a single isolated instance"); see, e.g., Costello v. Hynes, 1997 U.S. Dist. LEXIS 14213, *8, No. 96 Civ. 6808 (LBS), 1997 WL 580704, at *3 (S.D.N.Y. September 18, 1997) ("The Second Circuit has clearly held that an isolated incident of interference with prisoner's mail does not give rise to a cognizable claim under § 1983") (internal citation omitted). Here, Standley alleges precisely such a "single isolated instance" of improper procedure in delivering legal mail. n2

> n2 The Amended Complaint does allege in general terms that defendant Lyder "has engaged in a systematic practice of opening plaintiff's legal mail outside of his presence." P 31. But the only instance of such opening alleged, other than those already dismissed by Judge Griesa as relating to non-legal mail, is the Court of Claims incident discussed in the text.

Standley's claim also fails [*8] because he fails to allege facts establishing that this single incident interfered with his reasonable access to the courts. This Court has routinely dismissed claims of sporadic interference with mail that did not allege actual prejudice to a prisoner's ability to vindicate his legal claims. See, e.g., Davidson v. Scully, 1999 U.S. Dist. LEXIS 16193, *15 n.3, No. 81 Civ. 0390 (PKL), 1999 WL 961775, at *5 (S.D.N.Y. October 21, 1999) ("To prevail on a claim of interference with legal mail, a plaintiff must show that a pending or anticipated legal action was prejudiced by the alleged interference") (citing Morgan v. Montanye, 516 F.2d 1367, 1372 (2d Cir. 1975) and Herrera v. Scully, 815 F. Supp. 713, 725 (S.D.N.Y.1993)); Costello, 1997 WL 580704, at *3 ("Plaintiff must allege facts . . . demonstrating that the alleged interference actually impeded his access to the courts or prejudiced an existing action") (internal citations omitted). In Costello, Judge Sand ruled that even where there were two incidents, and the court assumed that the interference resulted from deliberate collusion by state officials, the plaintiff failed to state a claim where no [*9] actual injury to the plaintiff was alleged. 1997 WL 580704, at *3-4. Judge Preska has similarly held that to state a cognizable claim for interference with legal mail, a plaintiff must show deliberate and malicious interference with access to the courts and a resultant material prejudice in a pending legal proceeding. See Hudson v. Greiner, 2000 U.S. Dist. LEXIS 17913, No. 99 Civ. 12339 (LAP), 2000 WL 1838324, at *4 (S.D.N.Y. December 13, 2000) ("plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue") (internal quotation marks and citation omitted).

This case is strikingly similar to those cited. Standley's Amended Complaint makes no claim of actual prejudice. Rather, he merely alleges in conclusory fashion that he thinks something from the package was missing, without explaining what, or why the missing items (if any) frustrated his access to the Court of Claims. (Am. Compl. PP 26-27.) He does not allege that he received the package after a court-imposed deadline (id. P 27), or that he was denied an opportunity in the Court [*10] of Claims to present his opposition to the state's motion to dismiss (id. 30). Nor does he allege that the defendants' conduct caused him to lose an otherwise meritorious claim. See Jermosen v. Coughlin, 877 F. Supp. 864, 871 (S.D.N.Y. 1995) ("To state a valid § 1983 claim . . ., [plaintiff] must show that the alleged deprivation actually interfered with his access to the courts or prejudiced an existing action").

These failings to not appear to be mere oversights by a pro se litigant. His memorandum of law, which fleshes out his allegations, makes clear that the chief consequence of the defendants' alleged conduct was that adjudication of plaintiff's Court of Claims action was "delayed" for several months, and admits that the Court of Claims did indeed "ultimately permit[] plaintiff to file a reply brief." (Pl.'s Mem. Law at 2.) Thus, as in Costello, plaintiff's Amended Complaint "does not demonstrate actual injury as a result of the claimed interference with his legal mail." 1997 WL 580704, *3. Even if it is presumed that defendants acted deliberately and maliciously to interfere with his access to the courts, a § 1983 claim is supportable [*11] only where a complaint "show[s] facts indicating frustration of [plaintiff's] reasonable access to the courts." Id. (citing Lewis v. Casey, 518 U.S.

343, 345, 135 L. Ed. 2d 606, 116 S. Ct. 2174 (1996)). Standley's Amended Complaint, which contains no more than conclusory allegations, without any indication of what was pending before the Court of Claims, or how, specifically, the defendant's conduct frustrated his suit, falls short of that standard. These allegations do not establish that defendants' conduct frustrated his reasonable access to the Court of Claims. Indeed, it appears that he did have such access, and was provided with every opportunity to present his legal arguments to the Court of Claims. "A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Jermosen v. Coughlin, supra, 877 F. Supp. at 871 n3

> n3 Nor is there merit to plaintiff's claim that the defendants' alleged violations of Department of Corrections (DOCS) procedures raise a colorable § 1983 claim, rather than simply a question of state law. Standley argues that the DOCS "has created a constitutionally protected liberty pursuant to DOCS Directive 4421, which mandates that a prisoner has an unmistakable right to be free from intrusions upon 'legal' and 'privileged' mail." (Standley Aff. P 14.) Plaintiff is correct that due process liberty interests may be found in the dictates of prison regulations, but the Supreme Court has limited those interests to "freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 483-84, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995); Taylor v. Rodriguez, 238 F.3d 188, 194 (2d Cir. 2001) (same) (quoting Sandin). Because regulations concerning the processing of incoming mail plainly does not involve freedom from restraint or impose atypical hardship, plaintiff's claim fails. See, e.g., Pacheco v. Comisse 897 F. Supp. 671, 680 (N.D.N.Y. 1995) (rejecting similar challenge to alleged violation of DOCS Directive 4421 on grounds that such violation does create a liberty interest under Sandin).

[*12]

In his opposition to the instant motion, Standley relies principally on Key v. Artuz, No. 95 Cv. 0392 (HB) (S.D.N.Y. September 12, 1995), which held that "the inability to comply with . . . a court imposed deadline is precisely the kind of injury or prejudice that courts have referred to in determining if an inmate has actually been denied access to [the] courts." (internal quotation marks omitted) (alterations in original). But Key confirms the defects in Standley's Amended Complaint. There, plaintiff alleged "repeated and significant delay[]" in delivering legal mail, resulting in plaintiff's receipt of the state's opposition to a pending § 440.10 motion after a court-imposed deadline for plaintiff's reply. Id. Here, by contrast, Standley does not allege that he received legal mail after a court-imposed deadline, only that something (without alleging what) appeared to be missing, which hindered him (without alleging how) from preparing a timely response, which (in any event) he was later granted leave to file. Such conclusory allegations cannot sustain a § 1983 claim. n4

> n4 Plaintiff also relies on decisions from other circuits which he cites as supporting the claim that one instance of opening legal mail outside an inmate's presence is enough to state a Section 1983 claim. See, e.g., Taylor v. Sterrett, 532 F.2d 462, 475 (5th Cir. 1976); Huston v. Burpo, 1995 WL 73097, at *2 (N.D. Cal. February 13, 1995). Neither case support such a claim. In Burbo, the plaintiff alleged several instances of interference and delays in receipt of legal mail, yet the court dismissed the complaint because (like Standley) the plaintiff "did not alleged an 'actual injury' to court access." 1995 WL 73097, at *3. As for Sterrett, the Fifth Circuit has since explicitly questioned its continued authority, holding that violation of a "prison regulation requiring that a prisoner be present when his incoming legal mail is opened and inspected is not a violation of a prisoner's constitutional rights." See Brewer v. Wilkinson, 3 F.3d 816, 825 (5th Cir. 1993).

[*13]

For the foregoing reasons, plaintiff's Amended Complaint fails to state a claim on which relief can be granted. Because plaintiff has already availed himself of an opportunity to replead, and has failed to allege any relevant facts beyond those in his initial Complaint, it would be permissible to dismiss without leave to file further pleadings. See, e.g., DeJesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 71-72 (2d Cir.) (no abuse of discretion to dismiss a complaint without leave to replead "when a party has been given ample prior opportunity to allege a claim"). Nevertheless, because plaintiff is pro se, the Court will consider a motion for leave to amend his pleading if filed within 30 days, if there are additional facts that plaintiff has inadvertently failed to include. Plaintiff is advised not to replead unless he can truthfully allege sufficient facts to establish (1) that there were more than isolated or sporadic instances of interference with incoming legal mail (not including the purported violations that have already been dismissed), such that

Case 7:07-cv-03129-SCR   Document 3-5   Filed 06/15/2007   Page 10 of 17

Page 5
2001 U.S. Dist. LEXIS 2274, *

his reasonable access to the courts was denied, or (2) that as a result of the defendants' deliberate indifference [*14] with his legal mail, plaintiff suffered actual prejudice in the Court of Claims.

Conclusion

The motion to dismiss is granted.

SO ORDERED:

Dated: New York, New York

March 6, 2001

GERARD E. LYNCH

United States District Judge

# EXHIBIT N

LEXSEE 2001 U.S. DIST. LEXIS 450


Positive
As of: Jun 11, 2007

NEERAJ GUPTA, Plaintiff, -v- ROBERT M. RUBIN; GERSTEN, SAVAGE & KAPLOWITZ, LLC; JAY M. KAPLOWITZ, Esq.; ODIMO.COM, INC., f/k/a DiamondDepot.com, Inc.,; LENORTH HOLDINGS, S.A.; NORTHERN FINANCING GROUP LTD., LIPTON PARTNERSHIP NO. 2, LTD.; DATA INVESTMENT, LLC; and SHAUL OLMERT, Defendants.

00 CIV. 3091 (DLC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2001 U.S. Dist. LEXIS 450

January 24, 2001, Decided
January 25, 2001, Filed

**DISPOSITION:** [*1] Defendants' motion to dismiss denied without prejudice.

**COUNSEL:** For Plaintiff: Roger B. Kaplan, Wilentz, Goldman & Spitzer, New York, NY.

For Gersten, Savage & Kaplowitz, LLC, Jay. M. Kaplowitz, Esq., Defendants: Janice J. DiGennaro, Douglas Tischler, Rivkin, Radler & Kremer LLP, Uniondale, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION:**

OPINION & ORDER

DENISE COTE, District Judge:

On April 21, 2000, plaintiff Neeraj Gupta ("Gupta") filed a verified complaint in this diversity action. This Court stayed the action on July 20, 2000, pending a ruling by the United States District Court of the Southern District of Florida in Northern Financing Group, Ltd. v. Rubin, 00 Civ. 1419 (the "Florida Action"). By letter of October 6, 2000, plaintiff's counsel represented that the Florida Action had been dismissed, and the Court thereafter lifted the stay. On October 23, 2000, in advance of any answer, defendants Gersten Savage & Kaplowitz, LLC ("Gersten Firm") and Jay M. Kaplowitz, Esq. ("Kaplowitz") (collectively, the "Gersten Defendants") filed a motion to dismiss pursuant to Rules 9(b), 12(b)(1) and 12(b)(6), Fed. R. Civ. P. For the reasons discussed below, [*2] the motion is denied without prejudice to its renewal if the defects noted below are not cured in an amended pleading.

BACKGROUND

The facts in the verified complaint relevant to this motion include the following. The plaintiff, Gupta, and his family founded DiamondDepot Corporation ("DDC") on or around July 31, 1998. Gupta served as President and Chief Executive Officer and "substantially managed and controlled" DDC's operations and affairs through 1999. In late 1998, and continuing through 1999, DDC created and operated an e-commerce business selling diamonds, fine jewelry and watches over the Internet through the website DiamondDepot.com. By 1999, the website had generated substantial revenues, and DDC began seeking capital financing in order to expand its operations. To that end, Gupta contacted numerous investment bankers, underwriters and venture capitalists. Eventually Gupta came into contact with Robert Rubin ("Rubin"), whom he met with in late April or early May 1999, at the New York offices of M.S. Farrell & Co. ("M.S. Farrell"). M.S. Farrell subsequently transmitted to Gupta a proposed term sheet for a capital transaction

Case 7:07-cv-03129-SCR    Document 3-5    Filed 06/15/2007    Page 13 of 17

Page 2
2001 U.S. Dist. LEXIS 450, *

involving M.S. Farrell as the underwriter [*3] as well as a proposal for a bridge loan for DDC. At a meeting to discuss these proposals with Rubin, the Guptas indicated that they, as well as DDC, were represented by McCarter & English ("McCarter"). Rubin explained that the Guptas and DDC would need to use the Gersten Firm which had "a great deal of experience" in similar deals. In late July, pursuant to Rubin's request, Gupta spoke by telephone with principals and partners of the Gersten Firm. At that point, "Gupta retained the Gersten Firm to negotiate with M.S. Farrell." It is unclear from the wording of the Complaint whether Gupta hired the Gersten Firm solely on behalf of DDC or on behalf of himself as well. Gupta alleges that at no time did the Gersten Firm or Kaplowitz reveal business or social relationships with Rubin, which Gupta calls "substantial conflicts of interest." In particular, Gupta alleges that Kaplowitz had "substantial business relationships" with Rubin and was a "substantial co-shareholder" with Rubin in corporations, including StyleSite Marketing, Inc. which Kaplowitz and Rubin were at that time "actively working to take public" as principals and for which the Gersten Firm served as corporate counsel. Gupta [*4] further alleges that, unknown to him at that time, Rubin was a customer/runner for M.S. Farrell who was in the practice of directing transactions to M.S. Farrell for an interest in deals, using the Gersten Firm and Kaplowitz to further these objectives. After the Gerstein Firm informed M.S. Farrell that Gupta was represented, M.S. Farrell transmitted on August 6, two proposals to the plaintiff and DDC, the first for an IPO of DDC and the second for a bridge loan by M.S. Farrell for the amount of $ 500,000.00 to $ 750,000.00.

The plaintiff alleges that the M.S. Farrell proposals contained no reference to Rubin or to Rubin receiving or having the right to receive any stock from DDC. On August 11, 1999, however, the plaintiff received a fax from "Robert M. Rubin, Esq." in which Rubin stated that he was enclosing a check for $ 20,000 which represented a down payment for a proposed subscription by Rubin for 620,000 shares of DDC common stock, at a price of $ 100,000.00, or .0620 cents per share. The check was never received. The letter also stated that Rubin had proposed to introduce DDC to "various strategic relationships," and that DDC would consider forgiving all or a portion of the [*5] balance owed for the subscription based on the results of these introductions. The plaintiff later learned that the letter was prepared by the Gersten Firm and signed on behalf of Rubin pursuant to Kaplowitz's instructions. The plaintiff alleges that this letter was an offer by Rubin to obtain an equity interest in DDC independent of the M.S. Farrell transaction. Gupta rejected the letter and provided Kaplowitz with an unsigned counter-proposal, which proposed providing Rubin with "the right to have a contingent purchase of $ 620,000 shares of [DDC], contingent on the successful closing of an underwritten public offering by M.S. Farrell on behalf of [DDC]" (emphasis in original). On or about August 28, 1999, Gupta, on behalf of DDC, executed the commitment letter and the bridge loan commitment letter of August 6. n1

> n1 In its proposal, M.S. Farrell specified a 2.5% "breakup" commission to which Gupta objected. M.S. Farrell explained that, although such a commission was unenforceable under NASDAQ rules, it desired the clause anyway.

[*6]

Gupta alleges that M.S. Farrell unreasonably delayed the closing of the bridge loan and IPO. As a result, Gupta began exploring other options for equity financing and closed a transaction on November 18 with defendants Northern Financing Group, Ltd., Lenorth Holdings, S.A., Data Investments Investment LLC and Lipton Partnership No. 2, Ltd. ("Investor Defendants"), by which the companies purchased an 85% equity interest in DDC for $ 6,700,000.00. n2 DDC subsequently changed its name to Odimo.com, Inc. ("Odimo"). While Gupta and DDC disclosed the discussions with M.S. Farrell and the letters of August 6, 1999, it did not disclose "any prior negotiations which had not resulted in an obligation or contract concerning the sale of capital stock of [DDC]," including the letter from, and conversation with, Rubin concerning the request to obtain a right to purchase DDC shares (emphasis in original).

> n2 Gupta retained 10%, or 669,000 shares, of the outstanding capital stock of Odimo. Pursuant to the agreement, Gupta pledged 667,666 of his common stock with defendant Shaul Olmert, the investor companies' Pledge Escrow Agent, as security for the representations and warranties agreed to by Gupta and DDC.

[*7]

Gupta alleges that during a telephone conversation with Rubin, Gupta "confirmed to Rubin that the proposed deal with M.S. Farrell was dead." At no time during the conversation, or in response to Gupta's letter of December 1, 1999, to Rubin and Kaplowitz confirming the telephone conversation, did Rubin "in any way assert or suggest that Gupta or [DDC] was in any way obligated to sell any stock of [DDC] to Rubin." Gupta and the Gersten Firm concluded their relationship on December 6, 1999.

Sometime later, Rubin asserted his rights to Odimo's stock. The plaintiff alleges that, although he knew that his claims were "utterly false," Rubin argued that Gupta

had "entered into an unwritten, unsigned verbal agreement" with him. In support of his claims, Rubin provided Odimo with draft private placement memoranda ("PPMs") where were prepared by Kaplowitz in connection with the M.S. Farrell deal and which "purported to reflect an agreement" between DDC and Rubin. The plaintiff alleges that Rubin and Kaplowitz added the language into the drafts and then, in order to "lull Gupta and to advance Rubin's position," assured Gupta that the drafts were "only drafts" and "not binding." Rubin has [*8] threatened to sue Odimo. Gupta has been threatened with suit by the Investor Defendants, and he has been sued in a Florida action by two of them. Gupta alleges that the Florida suit is an attempt to squeeze Gupta and his family out of Odimo and to improperly use Gupta's stock to satisfy Rubin's demands.

As against Kaplowitz and the Gersten Firm, the Complaint alleges one count of fraud and one count of malpractice, negligence and breach of fiduciary duty. In particular, Count II alleges that Rubin, Kaplowitz, and the Gersten Firm "engaged in a scheme and artifice to defraud Gupta and [DDC] by false pretenses and misrepresentations in an effort to unfairly and improperly extort stock from the Corporation in advance of its planned initial public offering." Count III alleges that Kaplowitz and the Gersten Firm owed the plaintiff -- as his attorneys -- a fiduciary duty of loyalty and the utmost good faith and fair dealing as well as a duty to act with diligence and with reasonable professional care. Plaintiff alleges that Kaplowitz and the Gersten Firm breached these obligations when they failed to disclose their "substantial business relationships" with Rubin and "conspired to assist [*9] Rubin in fraudulently obtaining an equity interest" in Odimo.

On October 3, 2000, the Florida action was dismissed for lack of personal jurisdiction over Gupta. On October 26, 2000, defendant Rubin filed and served his Answer to the Verified Complaint in this action and asserted counterclaims against the plaintiff and cross-claims against DDC. n3 All of the remaining defendants, with the exception of the Gersten Firm and Kaplowitz, filed and served an Answer and asserted a counterclaim against the plaintiff on December 1, 2000. n4 In their motion to dismiss, the Gersten Firm and Kaplowitz make four arguments: (1) that this Court lacks subject matter jurisdiction over the plaintiff's claims; (2) that the plaintiff has no standing to sue for the alleged wrong done to DDC; (3) that the complaint fails to state claims of malpractice, breach of fiduciary duty, and negligence; and (4) that the complaint fails to state a claim for fraud or fails to state the claim with particularity.

        n3 Rubin asserts two counterclaims against the plaintiff: (1) that Gupta committed fraud in that Rubin relied to his detriment on the representations made by Gupta on behalf of DDC concerning an alleged agreement giving stock to Rubin if M.S. Farrell raised "significant capital" for DDC and that Gupta and DDC failed to disclose their abandonment of the agreement with M.S. Farrell; and (2) that Rubin is entitled to a declaratory judgment that he is the owner of 620,000 shares of stock.

[*10]

        n4 These defendants assert that Gupta is obligated to indemnify them for any claim relating to or arising from the "untruth, inaccuracy or breach" of any agreements or warranties made by Gupta. In particular, these defendants demand indemnification from the liability or expense resulting from Rubin's demands for stock.

## DISCUSSION

### I. Choice of Law

The parties do not address choice of law but do rely on New York law in making their arguments. In a diversity action, the choice of law analysis is based on the forum state's choice of law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941). In Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279 (N.Y. 1963), the New York Court of Appeals adopted a flexible approach to choice of law, focusing on the law of the state with the most significant interest in the dispute. See also Padula v. Lilarn Properties Corp, 84 N.Y.2d 519, 620 N.Y.S.2d 310, 311, 644 N.E.2d 1001 (N.Y. 1994). In this case, plaintiff is a citizen [*11] and resident of New Jersey, while defendants include individuals, partnerships, limited liability companies, or corporations which are either residents of New York, have their principal place of business in New York, conduct and transact business on a continuous basis in New York, and/or conduct substantial transactions and business in New York with respect to the transactions and occurrences alleged in the Complaint. The critical meetings in this action occurred in New York and were the sites of the alleged malpractice, negligence, breach of fiduciary duty, and fraud at issue in this motion. In conjunction with the parties' reliance on New York law in their submissions on this motion, the Court concludes that New York law applies in this case. See, e.g., Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52 (2d Cir. 1984) ("In the absence of a strong countervailing public policy, the parties to a litigation may consent by their conduct to the law to be applied.").

## II. Subject Matter Jurisdiction and Standing

The Gersten Defendants appear to make two arguments concerning subject matter jurisdiction and standing. First, they contend that the [*12] case is not ripe because the plaintiff has suffered no injury and thus no justiciable case or controversy exists. Second, they argue that the plaintiff lacks standing because he has not personally suffered any injury.

Article III of the Constitution permits federal courts to hear only those disputes which are ripe, that is "real and substantial controversies admitting of specific relief. [They may not issue] an opinion advising what the law would be upon a hypothetical state of facts." Auerbach v. Board of Educ. of the Harborsfield Cent. Sch. District of Greenlawn, 136 F.3d 104, 108 (2d Cir. 1998) (internal quotation omitted). An Article III court "cannot entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir. 1998) (internal quotation omitted). Consequently, "when resolution of an issue turns on whether there are nebulous future events so contingent in nature that there is no certainty they will ever occur, the case is not ripe for adjudication." Id. (internal quotation omitted).

Related to the doctrine of ripeness [*13] is the concept of standing. "Under Article III of the Constitution, it is 'axiomatic' that a federal court may not exercise jurisdiction over a dispute unless the plaintiff shows 'that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" Jones v. Unum Life Insurance Co. of America, 223 F.3d 130, 141 (2d Cir. 2000) (quoting Blum v. Yaretsky, 457 U.S. 991, 999, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982)). Standing requires three elements: "(1) that the plaintiff suffered personal injury or threat of injury; (2) that the injury fairly can be traced to the action challenged ('causation'); and (3) that the injury is likely to be redressed by the requested relief ('redressibility')." Fund for Animals v. Babbitt, 89 F.3d 128, 134 (2d Cir. 1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)). The injury must be "concrete in nature and particularized to the plaintiff." Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1091 (2d Cir. 1995) (internal quotation omitted).

The Gersten Defendants [*14] argue that the case is not ripe because no injury has yet occurred to the plaintiff. Specifically, the plaintiff has not been compelled to pay over any corporate stock to Rubin, the plaintiff has not been adjudged liable to Odimo, and the Florida action discussed in the Complaint has been dismissed. There is, as the Florida lawsuit and the counterclaims lodged in this suit underscore, an active dispute between Rubin and the plaintiff over ownership of certain shares of Odimo, and between the plaintiff and the Investor Defendants concerning Rubin's claims. Moreover, the plaintiff has presented sufficient information to allege successfully, as discussed below, that these disputes and injuries arise in part from the actions of the Gersten Defendants. The plaintiff has argued in his submissions that the documents prepared by the Gersten Defendants have precluded him from obtaining possession of his shares of Odimo stock.

In a related argument, the Gersten Defendants argue that the plaintiff lacks standing because the Gersten Firm represented DDC and not Gupta. Therefore, any suit against them must be brought by DDC. As already noted, the plaintiff presented sufficient facts to show that [*15] he has been injured by the Gersten Defendants' actions, and therefore has standing, to assert his claims. These injuries constitute the actual or threatened personal injury required to allege ripeness and standing. Whether the legal theories he has pleaded survive shall be addressed below.

## III. Malpractice, Negligence, and Breach of Fiduciary Duty

The Gersten Defendants argue that the complaint should be dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P., because the plaintiff has failed to state a claim for malpractice, negligence, and breach of fiduciary duty. A court may dismiss an action pursuant to Rule 12(b)(6) only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." Jaghory v. New York State Dep't of Education, 131 F.3d 326, 329 (2d Cir. 1997). The court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." Id. The court is generally prohibited from considering matters outside the pleadings for a motion to dismiss for failure to state a claim [*16] upon which relief can be granted. Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 325 n.1 (2d Cir. 1999). The court can dismiss the claim under Rule 12(b)(6) only if, assuming all facts alleged to be true, the plaintiff still fails to plead the basic elements of a cause of action. "General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint." Hirsch, 72 F.3d at 1092.

### A. Malpractice and Negligence

Under New York law, an action for damages for legal malpractice or for negligence requires proof of the following elements: (a) a duty; (b) a breach of duty; and (c) actual damages "proximately caused by the breach of

the duty." Tinelli v. Redl, 199 F.3d 603, 606 (2d Cir. 1999) (malpractice); see also Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc., 113 F.3d 296, 299 (2d Cir. 1997) (negligence). An attorney must "exercise ordinary skill and diligence in his representation of clients." Skinner v. Stone, Raskin & Israel, 724 F.2d 264, 266 (2d Cir. 1983); see also Barry v. Liddle, O'Connor, Finkelstein & Robinson, 1997 U.S. Dist. LEXIS 18820, No. 93 Civ. 8707 (CSH), 1997 WL 736725, [*17] at *2 (S.D.N.Y. Nov. 25, 1997).

In general, only the party retaining the services of an attorney can bring a legal malpractice action against him. Catizone v. Wolff, 71 F. Supp. 2d 365, 368 (S.D.N.Y. 1999). The defendants argue that they represented DDC and not the plaintiff individually, as indicated by an unsigned retainer agreement between DDC and the defendants. While the attorney-client relationship arises only when an individual "contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services," formality is "not an essential element in the employment of an attorney." Id. Instead, courts must "look at the words and conduct of the parties." Id. Courts have considered several factors in determining whether an attorney-client relationship exists, including whether a fee arrangement was entered into or a fee was paid, whether a written retainer exists, whether the attorney actually represented the individual, for example at a deposition, and whether the purported client reasonably believed that the attorney was representing him. Id. A party's "unilateral belief" that he is represented by counsel "does not confer upon [*18] him the status of client unless there is a reasonable basis for his belief." Id. at 371.

The Complaint does not indicate with sufficient clarity whether the defendants were hired solely on behalf of DDC or for the plaintiff as well, n5 but the plaintiff asserts in his affidavit that the defendants "advised me directly on aspects of the negotiations that were particular to my individual interests," such as his salary, stock options, and the non-recourse nature of the bridge loan. The affidavit further asserts that the plaintiff made decisions based on the defendants' advice and that "at all relevant times, it was my understanding that the Gersten defendants were providing this advice to represent my best interests in addition to their representation of [DDC]" (emphasis in original). To avoid dismissal of his claims of negligence and malpractice, the plaintiff must amend his Complaint to assert explicitly that he was a client of the Gersten Firm in connection with the events which form the basis of these causes of action.

n5 The Complaint alleges that Rubin told the Guptas at a meeting in July 1999 that "the Guptas and the Corporation had to use the Gersten Firm," but the Complaint also alleges that a letter from David Broderick of McCarter to M.S. Farrell indicated that only DDC would be retaining a New York law firm. Further, as noted earlier, the Complaint alleges only that "Gupta retained the Gersten Firm to negotiate with M.S. Farrell on the proposed M.S. Farrell deal."

[*19]

The Gersten Defendants next argue that the Complaint fails to allege any breach of duty because the alleged ethical violations do not rise to the level of an actionable tort. Plaintiff alleges that the Gersten Defendants breached their duty of care to the plaintiff because of their representation of Rubin on other matters and the "substantial business relationships" between Kaplowitz and Rubin, constituting a conflict of interest.

Under New York rules of professional conduct, a lawyer generally cannot simultaneously serve clients with conflicting interests. Disciplinary Rules "are mandatory in character" and "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Kittay v. Kornstein, 230 F.3d 531, 538 n.3 (2d Cir. 2000) (internal quotation omitted). Disciplinary Rule 5-105 of the New York Code of Professional Responsibility provides that

> (a) A lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in [*20] representing differing interests . . .
> (b) A lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests."

Rule 5-105(a) and (b), N.Y. Code of Professional Responsibility; see also Kittay, 230 F.3d at 537-38. A lawyer may only represent multiple clients in the situations presented in Rule 5-105(a) and (b) if "it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the implications of the simultaneous representation and the advantages and risks involved." Rule 5-

105(c), N.Y. Code of Professional Responsibility (emphasis added); see also Kittay, 230 F.3d at 538. Further, Rule 5-101(a) prohibits a lawyer from accepting "employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests." Rule 5-101(a), [*21] N.Y. Code of Professional Responsibility; see also In re Edelstein, 214 F.3d 127, 129 (2d Cir. 2000). The cases cited by the defendants principally involve associated sanctions of professional discipline bringing "baseless legal proceedings" on behalf of their clients, or laws governing suits brought by third parties. See Hashemi v. Shack, 609 F. Supp. 391, 397 (S.D.N.Y. 1984); Drago v. Buonagurio, 46 N.Y.2d 778, 386 N.E.2d 821, 822, 413 N.Y.S.2d 910 (N.Y. 1978). Neither situation applies here. The plaintiff has alleged facts sufficient to support his claim that the Gersten defendants simultaneously represented him and Rubin, that the Gersten defendants were involved in substantial business transactions with Rubin, that the joint representation adversely affected the plaintiff and that in any event it was not disclosed to him.

. **Breach of Fiduciary Duty**

Under New York law, the elements for inducing or participating in a breach of fiduciary duty are: (a) a breach by a fiduciary of obligations to another; (b) that the defendant knowingly induced or participated in the breach; and (c) that the plaintiff suffered damages as a result of the breach. See Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir. 1986); [*22] Antonios A. Alevizopoulos and Assoc., Inc. v. Comcast Int'l Holdings, Inc., 100 F. Supp. 2d 178, 188 (S.D.N.Y. 2000). The Gersten Defendants' motion raises no issues that are unique to this cause of action or that have not been addressed in connection with the negligence and malpractice claims. Accordingly, for the reasons discussed above, the defendants' motion to dismiss for failure to state a claim of breach of fiduciary duty is denied.

**IV. Fraud**

Defendants argue that the plaintiff fails to state a claim for fraud. n6 Under New York law, a plaintiff must prove five elements by clear and convincing evidence to prevail on a claim of fraud: (a) a material misrepresentation or omission of fact; (b) made with knowledge of its falsity; (c) with an intent to defraud; and (d) reasonable reliance on the part of the plaintiff; (e) that causes damage to the plaintiff. Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 98 (2d Cir. 1997). A plaintiff may state a claim for fraudulent misrepresentation if "he relied to his detriment on the defendant's misrepresentation" and "the defendant intended the misrepresentation to be conveyed to him. [*23] " Securities Investor Protection Corp. v. BDO Seidman, LLP, 222 F.3d 63, 71 (2d Cir. 2000). The Gersten Defendants argue that the plaintiff has failed to allege a sufficiently material misrepresentation, asserting that the sole allegations are (1) that Kaplowitz inserted language into a draft PPM which purported to reflect an agreement between Rubin and DDC, and (2) that Kaplowitz told the plaintiff that the PPM was "only" a draft and could be changed. Defendants argue that Kaplowitz's statement to the plaintiff that the draft language could be changed was an accurate statement of the law.

> n6 Defendants also argue that the plaintiff failed to state the claim with the particularity required under Rule 9(b), Fed. R. Civ. P. As discussed below, the defendants focus the entirety of their argument on the statement made by Kaplowitz regarding the draft PPM, citing Rule 9(b) law for material misrepresentations. Because the plaintiff also alleges a material omission for the defendants' failure to disclose their relationship with Rubin, and the defendants have failed to contest the adequacy or particularity of that claim, it is unnecessary to address their Rule 9(b) argument.

[*24]

The Gersten Defendants have not recited each of the Complaint's relevant allegations. The Complaint also asserts that the defendants failed to reveal their relationship with Rubin to the plaintiff at the time they were retained even though that simultaneous representation constituted a conflict of interest. Moreover, in his affidavit, the plaintiff states that he made decisions to his detriment based on the defendants' advice and without the knowledge of their relationship with Rubin. With these additional facts alleged in an amended complaint plaintiff will adequately plead the materiality of the omission, satisfying Rule 9(b) as well as the elements of a claim for fraud. The Court grants him leave to amend.

**CONCLUSION**

For the reasons discussed above, the defendants' motion to dismiss is denied without prejudice to its renewal if the defects are not cured in an amended pleading filed by February 7, 2001.

SO ORDERED:

Dated: New York, New York

January 24, 2001

DENISE COTE

United States District Judge